T.C. Memo. 2001-5

UNITED STATES TAX COURT

WADE H. GRIFFIN, III, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12900-98.                    Filed January 9, 2001.

<u>William E. Frantz</u>, <u>Brenda G. Bates</u>, and <u>Donald P. Edwards</u>
(specially recognized), for petitioner.

<u>David R. Mackusick</u> and <u>Gwendolyn C. Walker</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent, for petitioner's 1994 taxable
year, determined a $1,443,439 income tax deficiency and an
accuracy-related penalty under section 6662(a),[1] in the amount of

---

[1]  Unless otherwise indicated, section references are to the
Internal Revenue Code in effect for the taxable year under
(continued...)

$19,253. The parties have resolved some of the adjustments that were in controversy, and the following issues remain for our consideration: (1) Whether any portion of a $4,997,896 lawsuit settlement is excludable under section 104(a)(2); (2) whether the portion of the settlement paid to petitioner's attorneys under a contingency fee arrangement should be included in petitioner's gross income; and (3) whether petitioner is liable for an accuracy-related penalty under section 6662(a).

FINDINGS OF FACT[2]

Petitioner resided in Mobile, Alabama, at the time his petition was filed in this case. Petitioner purchased an automobile dealership in Mobile, Alabama, in 1982, and James R. Jordan (Jordan) was his sales manager. Around 1985, petitioner was advised of the availability for sale of a Toyota automobile dealership in Enterprise, Alabama. Representations were made by the sellers to petitioner concerning the amount of vehicles sold each month and the profits that could be expected. Petitioner and Jordan became interested in purchasing the Toyota dealership and provided personal information to the sellers, Toyota-GMC of Enterprise, Inc., an Alabama corporation. Petitioner and Jordan

---

[1](...continued)
consideration, and Rule references are to this Court's Rules of Practice and Procedure.

[2] The parties' stipulations of fact and exhibits are incorporated by this reference.

subsequently submitted an application and were accepted to become Toyota dealers.

Prior to entering into a dealership agreement, petitioner met with an executive of Southeast Toyota Distributors, Inc. (SET), one of a group of related companies that controlled the financing and distribution of the Toyota automobiles until they arrived at the dealers within the regional area. On April 24, 1987, petitioner and Jordan formed an Alabama corporation, Hamp Griffin Toyota-GMC, Inc.(HGTG), to operate the Toyota dealership, which was purchased on May 27, 1987. Based on representations of SET employees and others, petitioner had invested in the dealership with the expectation of selling approximately 30 cars and 30 trucks per month at a profit of about $800 or $900 per vehicle.

Petitioner arranged for and became guarantor of a $1 million line of credit and personally borrowed $350,000 to lend to HGTG to commence its business. After beginning operations, petitioner learned that some of the representations were exaggerated and/or false, including the ability to generate income in the expected amounts. Petitioner also discovered that SET encouraged dealers to falsely report their vehicle information in order to cause an increase in their allocation of Toyota automobiles. Petitioner and Jordan did not participate in the false reporting. As a result, HGTG did not receive as large an allocation of vehicles

and was also forced to accept vehicles loaded with accessories that were more difficult to sell in its sales area because the increased price for the accessories made the selling price less competitive.

HGTG was also forced by SET to pay fees and participate in multiple-dealer "tent sales" because its allocation of vehicles was shipped to the tent location rather than to the dealership. In addition, HGTG was required to sell SET-related companies' extended service policies and financing with respect to any "tent sale".  Petitioner consulted SET's vice president of sales regarding HGTG's poor performance, and it was suggested that Jordan was not an effective manager and should be replaced by Tom Strickland (Strickland), who was connected with SET.  Ultimately, Strickland, beginning on April 14, 1988, became involved with HGTG by purchasing 15 percent of its shares and becoming its president and general manager.

In October 1988, Strickland's relationship with HGTG ended, and at that time petitioner found that HGTG's obligation to the finance company had not been paid under the floor plan financing agreement for the cars that had already been sold.  HGTG's financial problems became public, and petitioner experienced great stress for which he was treated by a doctor.  For the next several months petitioner was occasionally hospitalized for his condition, and, upon his July 1989 release from the hospital, he

closed the Toyota dealership.  In 1989, petitioner began seeing a psychiatrist and was experiencing symptoms of stress and anxiety and was diagnosed as being in a state of "major depression".

During April 1989, petitioner received a purchase offer for the Toyota dealership, but SET would not approve a sale, and instead SET instituted a foreclosure action against HGTG.  On May 5, 1989, HGTG voluntarily filed for a chapter 11 bankruptcy (reorganization), which was converted to a chapter 7 (liquidating) proceeding on November 2, 1989.

During September 1990, petitioner and HGTG retained attorney Vincent F. Kilborn (Kilborn) by means of a contingent fee arrangement under which the attorney's fee was 52-1/2 percent of any recovery or zero if there was no recovery.  Petitioner and HGTG were responsible for costs and expenses.  Thereafter, an action on behalf of petitioner and HGTG was commenced against Toyota Motor Sales U.S.A., Inc., and related companies, SET and related companies and its officers, and others.  Kilborn became aware of a South Carolina case involving SET and dealer allegations of being required to make false sales reports in order to stay in business.  Ross M. Goodman (Goodman) was brought in to assist in the representation.  Goodman was associated with a law firm that was representing dealers in connection with other Toyota cases.

Goodman was aware of a North Carolina dealer's case against SET where a State administrative law judge had issued extensive findings of fact, and Goodman relied on the findings and record in that case as a source for the allegations in petitioner's complaint against SET, et al. Kilborn and Goodman worked together to draft the final complaint, which was filed in the Circuit Court of Mobile County, Alabama, on or about September 27, 1990. Because the complaint was designed to replicate the approach used in other suits, it focused on the commercial losses of the dealership attributable to the defendants' misconduct.

The complaint is 60 pages in length and contains 123 jurisdictional and factual allegations and 13 counts, broadly categorized as follows: Count I, breach of contract; count II, promissory fraud; counts III to V, violations of the Alabama Motor Vehicle Franchise Act; count VI, felonious injury; count VII, interference with business relations; count VIII, willful misrepresentation; count IX, reckless misrepresentation; count X, suppression of material fact; count XI, promissory fraud; count XII, conspiracy; and count XIII, violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. sections 1961 and 1964(c). The factual allegations do not contain a claim or allegation that petitioner suffered any mental stress or depression. The allegations in the complaint address the business relationship and the improper and unfair tactics and

activities of the defendants that resulted in the "demise" of petitioner's and HGTG's Toyota dealership. Likewise, the 13 counts allege injuries and damages that are commercial in nature, and, although some of the counts sound in tort as the cause of action, no claim of mental stress or depression is set forth in the 13 counts.

Subsequent to the complaint's being filed, Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Credit Corp. (the defendants) argued in HGTG's bankruptcy proceeding that Goodman and Kilborn could not represent both petitioner's and HGTG's interests, and the attorneys elected to represent petitioner. The defendants also moved to dismiss petitioner from the case on the grounds that he was not a party to the dealership agreement and that the alleged injuries were to the corporation and not petitioner. In those motions and related documents, the defendants pointed out that the complaint focused on commercial harm to the corporate entity and that no claim appeared to have been made with respect to petitioner. The defendants' motion was referred to a magistrate judge, who issued a report and recommendation that set forth a proposed denial of the defendants' motion, and the report was adopted by a U.S. District Court Judge. The report did not address the merits of the cause of action but contained the conclusion that it was premature for a court to decide whether petitioner had standing. The report

also contained the recommendation that petitioner be given leave to amend the complaint and to distinguish between the individual's claim and those derivative through the corporate entity.

Thereafter an amended complaint was filed on behalf of petitioner outlining the personal items of fraud and coercion and the personal services nature of the contract. The amended complaint contained allegations that petitioner was personally involved in the transactions with the defendants, had a financial stake and obligations in connection with the auto dealership, and was harmed because of the flow-through nature of HGTG, an S corporation. The amended complaint did not contain allegations that petitioner suffered any mental stress or depression, and no demands were made for damages attributable to petitioner's mental stress or depression.

Late in 1993, the decision was made by petitioner and his attorneys to attempt settlement. A settlement agreement containing a confidentiality clause was entered into and approved by the bankruptcy court. The total settlement amount was $6 million, of which $557,257 was allocated to the bankruptcy trustee for the benefit of HGTG. In addition to the $557,257 amount for HGTG, $245,501.55 of claims against HGTG was discharged by SET and related companies. HGTG's final Form 1120S, U.S. Income Tax Return for an S Corporation, for the

period ended September 30, 1994, was filed by the bankruptcy trustee and reflected the $557,257 settlement amount, less claims for attorney's fees and other deductions in the amounts of $224,156.25 and $1,419.88, respectively. Petitioner did not receive Schedules K-1 or copies of HGTG's Federal tax returns that were filed during the pendency of the bankruptcy proceeding for HGTG's 1991 through 1994 tax years. Petitioner was not aware of the filing of HGTG's 1991 through 1994 returns, and he did not understand the operation or mechanics of bankruptcy proceedings.

The settlement agreement and release were in exchange for petitioner's general release of all claims against the defendants. The language of the settlement agreement was that it was to cover "all pending and potential claims (including, but not limited to, e.g., potential mental anguish claims by Wade H. Griffin, III * * *) that might have been brought". Of the $6 million settlement, $4,997,895.70 was disbursed in connection with petitioner's interests as follows:

| Recipient | For | Amount |
|---|---|---|
| Attorney Middlebrooks | Reimbursement of expenses | $250,000.00 |
| Attorney Kilborn | Reimbursement of expenses | 250,000.00 |
| Attorney Kilborn | Attorney's fees | 944,558.19 |
| Attorney Middlebrooks | Attorney's fees | 894,558.19 |
| Attorney Reed | Attorney's fees | 179,915.85 |
| Attorneys Phillips & Reems | Attorney's fees | 25,000.00 |
| Attorneys Silver & Voit | Attorney's fees | 16,078.38 |
| Chrysler Credit Corp. | — | 932,683.74 |
| Heritage Imports, Inc. | — | 244,853.28 |
| Petitioner | — | 1,260,248.50 |
| Total disbursed | | $4,997,895.70 |

Petitioner's Federal income tax returns, beginning in 1985 or 1986, were prepared by Von A. Gammon (Gammon), who at the time he prepared petitioner's 1994 return had been practicing accounting for 10 years. Gammon was not aware that HGTG had filed a 1994 return. Gammon also knew that petitioner had an unused loss carryover of $200,000 in connection with HGTG because petitioner did not have sufficient basis to claim the loss. Because of Gammon's knowledge of HGTG's creditors and outstanding debt, he believed that any 1994 return for HGTG would show losses, which petitioner could not claim because he did not have sufficient basis. Accordingly, no income or loss from HGTG was reflected on petitioner's 1994 return. Based on his above understanding, Gammon did not inquire about the status of HGTG's 1994 taxable year or whether a return was to be or had been filed. Petitioner's stock in HGTG was worthless as of December 31, 1994.

## OPINION

The issues for our consideration in this case require an analysis of whether any portion of the settlement proceeds received by petitioner or on his behalf may be excluded from petitioner's gross income. First, we consider whether any portion is excludable under section 104(a)(2). If some portion is includable, we shall then consider whether petitioner was

required to report the portion of the recovery paid to his attorneys.

Section 104(a)(2)

Except as otherwise specifically provided, gross income includes a taxpayer's income from whatever source derived.  See sec. 61(a); see also Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955).  Section 61(a) is broadly construed, whereas specific exclusions from gross income must be narrowly construed.  See Commissioner v. Schleier, 515 U.S. 323, 327-328 (1995).  For 1994, section 104(a)(2) specifically excluded from gross income "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness".  Section 1.104-1(c), Income Tax Regs., provides that "damages received" is an amount received (other than workmen's compensation) through prosecution of an action based upon tort or tort type rights.

When damages are received pursuant to a suit or settlement agreement, the nature of the underlying claim determines whether such damages are excludable under section 104(a)(2).  See United States v. Burke, 504 U.S. 229, 239 (1992); see also Metzger v. Commissioner, 88 T.C. 834, 847 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988).  "The critical question is, in lieu of what was the settlement amount paid?"  Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th

Cir. 1997); McKay v. Commissioner, 102 T.C. 465, 482 (1994). For the taxable year under consideration, personal injuries included both physical and nonphysical injuries. See Commissioner v. Schleier, supra at 329 n.4.

The Supreme Court has held that taxpayers may exclude damages received if the underlying cause of action giving rise to the recovery is based upon tort or tort type rights, and the damages are received on account of personal injuries or sickness. See id. at 336-337.

Petitioner's arguments are summarized as follows: (1) The claim for which the settlement was received generally sounded in tort; (2) petitioner has shown that he suffered mental and/or physical ailments in connection with actions of the defendants; and (3) under the law of the State of Alabama, petitioner's claims, although generally or broadly stated as founded upon commercial harm, could have included petitioner's mental suffering, and therefore the settlement is excludable under section 104(a)(2).

Conversely, respondent's arguments are summarized as follows: (1) The defendants' actions and/or petitioner's mental anguish is irrelevant because petitioner's pleadings were based on a mixture of tort, tort type, and nontort claims, and the settlement did not distinguish between or specify any particular claim; (2) petitioner's claims and the settlement were for

economic harm to HGTG and petitioner; and (3) the defendants were unaware that petitioner was asserting any claims for mental anguish, and, accordingly, the defendants did not intend to settle any particular claims for mental anguish.

As previously explained, petitioner must meet a two-prong test for exclusion of any part of the settlement proceeds. As to the first part, petitioner must show that the underlying cause of action giving rise to the recovery is based upon tort or tort type rights. In that regard, some of the 13 counts alleged in the pleadings sounded in tort, and would therefore satisfy the first prong of the Schleier test. We note, however, that petitioner's factual allegations in the pleading concerned commercial loss, and no allegations were made with respect to petitioner's emotional distress or sickness. In fact, the format used by petitioner's attorneys to formulate the pleadings was derived from another proceeding that concerned fraud and misrepresentation that resulted in commercial loss.

Petitioner, in the trial of this case, produced testimony from Alabama attorneys that the broad-based tort allegations in petitioner's pleadings would, under Alabama law, provide a foundation for subsequent allegations and proof of damages caused by personal injuries.[3]

---

[3] We find it unnecessary to analyze petitioner's position that he was able, at the time of the settlement, to subsequently
(continued...)

In summary, with respect to the first prong of the Schleier test, petitioner has shown that some tort or tort type rights were pleaded in the proceedings, which ended in settlement, but there was no specific pleading of personal injury or sickness. The more crucial question is whether petitioner has shown that the settlement was received on account of personal injuries or sickness.

The law is well settled that the tax consequences of an award for damages depend upon the nature of the litigation and on the origin and character of the claims adjudicated, and not upon the validity of those claims. See Bent v. Commissioner, 87 T.C. 236 (1986), affd. 835 F.2d 67 (3d Cir. 1987); Glynn v. Commissioner, 76 T.C. 116, 119 (1981), affd. without published opinion 676 F.2d 682 (1st Cir. 1982); Seay v. Commissioner, 58 T.C. 32, 37 (1972). In this case, petitioner received a global settlement intended to release the defendants from any claims that petitioner might have had.

In Commissioner v. Schleier, supra, the Supreme Court cautioned that there must be a direct link between the personal injury and the recovery of damages for the section 104(a)(2) exclusion to apply. Although petitioner has shown, by the

---

[3](...continued)
allege and prove personal injuries and/or sickness. We assume for purposes of this case that this legal position is correct. Irrespective of our views on that point of law, the outcome of this case would remain the same.

evidence presented to this Court, that he experienced mental anguish and psychological problems around the time of the "demise" of HGTG, he has failed to show a direct link between his mental anguish and the settlement recovery. Although there is a tangential reference to "mental anguish" in the settlement agreement as an example of potential claims "that might have been brought", there is no specific amount allocated to any of the 13 counts or any potential claims that petitioner might have had or that he might have subsequently attempted to perfect. Under these circumstances, petitioner has not shown that there was a direct link between the harm and the recovery; i.e., petitioner has not shown that the recovery was attributable to his personal injuries.

In addition, if the settlement agreement lacks express language stating what the settlement amount was paid to settle, then the most important factor in determining any exclusion under section 104(a)(2) is the intent of the payor as to the purpose in making the payment. See Stocks v. Commissioner, 98 T.C. 1, 10 (1992); Knuckles v. Commissioner, 349 F.2d 610, 612 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Metzger v. Commissioner, 88 T.C. at 847-848. Here, the settlement agreement was global in nature and was intended to settle the pending lawsuit and any other claims that might have been brought. There is no specific allocation to any particular claim. Mental anguish is only

tangentially referenced as a possible claim of petitioner in addition to those in the pending suit.

Accordingly, we are unable, in these circumstances, to find that a specific portion of the settlement was intended by the defendants to settle any potential claim petitioner might have had for mental anguish. See, e.g., Ramos v. Davis & Geck, Inc., 224 F.3d 30 (1st Cir. 2000). We note that the Court of Appeals for the Eleventh Circuit recently held, based on "unique facts", that damages to the taxpayer's business reputation was a personal injury within the meaning of section 104(a)(2). Fabry v. Commissioner, 223 F.3d 1261, 1270 (11th Cir. 2000), revg. 111 T.C. 305 (1998). Because any appeal by petitioner would be to the Court of Appeals for the Eleventh Circuit, we must consider whether facts in this case fall with the factual pattern upon which the taxpayers in Fabry were granted section 104(a)(2) relief.

In Fabry the tort committed resulted in the taxpayer's selling defective "merchandise that was said to have cheated the * * * [taxpayer's customers]." Id. Here, the tortfeasors interfered with petitioner's corporation's ability to earn income. The litigating success of petitioner and other car dealers against these same defendants was rooted in commercial losses due to misrepresentation and fraud (attributed to the defendants and not to petitioner). That was the focus of

petitioner's pleadings and claims in the case that was settled. Even though, at the time of the settlement, petitioner might have had the ability to pursue damages for his personal injuries, there is no way, on this record, to quantify the portion of the settlement payment(s) that might have been attributable to claims for mental anguish or personal injuries. The situation we consider is different from the one addressed by the Court of Appeals for the Eleventh Circuit in Fabry v. Commissioner, supra. Petitioner here sued for breach of contract, promissory fraud, violations of the Alabama Motor Vehicle Franchise Act, felonious injury, interference with business relations, misrepresentations and suppression of facts, and violation of RICO under title 18, U.S.C. The settlement was global and intended to settle all of petitioner's above-referenced claims and any other claim that could have been filed, including personal injury. Petitioner has not shown what portion, if any, of the settlement was or could be attributable to personal injury. In addition, petitioner made no claim for, and there is no showing of, damage to his personal business reputation as opposed to HGTG's reputation. Accordingly, Fabry v. Commissioner, supra, is inapplicable, and petitioner has failed to meet the second prong of the Schleier threshold test for exclusion of the recovery under section 104(a)(2).

The Attorney's Fees

Petitioner contends that the $2,519,000 that was paid to his attorneys should not be includable in gross income under the line of cases beginning with Cotnam v. Commissioner, 263 F.2d 119 (5th Cir. 1959), revg. in part and affg. in part 28 T.C. 947 (1957). Respondent contends that Cotnam was "wrongly decided". Respondent also contends that if the Cotnam holding is accepted as correct, then petitioner's execution of the contingent fee agreement resulted in an assignment of a portion of petitioner's claim to his attorneys--a taxable disposition of property.

Since the trial and briefing in this case, several courts have had the opportunity to consider the Cotnam holding. This Court reconsidered its view of the Cotnam holding following several opinions on the subject by Courts of Appeals, including the more recent Estate of Clarks v. United States, 202 F.3d 854 (6th Cir. 2000). After full reconsideration, this Court has concluded that it will "continue to adhere to our holding * * * that contingent fee agreements * * * come within the ambit of the assignment of income doctrine and do not serve * * * to exclude the fee from the assignor's gross income." Kenseth v. Commissioner, 114 T.C. 399, 412 (2000). Since our Kenseth holding, the Courts of Appeals for the Fifth and Eleventh Circuits have followed the Court of Appeals for the Fifth Circuit's holding in Cotnam. See Srivastava v. Commissioner, 220

F.3d 353 (5th Cir. 2000), revg. in part, affg. in part, and remanding T.C. Memo. 1998-362; Davis v. Commissioner, 210 F.3d 1346 (11th Cir. 2000), affg. T.C. Memo. 1998-248.

Respondent, however, raises a different theory here than the one that was decided in Kenseth. Respondent's primary argument is that Cotnam was wrongly decided by the Court of Appeals. If this Court decides that the Cotnam rationale was correct, then respondent argues that under the rationale of Cotnam, petitioner recognized gain on the initial transfer of his interest to his attorneys.

Respondent's alternative argument may be summarized as follows: (1) Cotnam holds "At the time that * * * [the taxpayer] entered into the contingent fee contract, she had realized no income from the claim, and the only use she could make of it was to transfer a part so that she might have some hope of ultimately enjoying the remainder." Cotnam v. Commissioner, 263 F.2d at 125. (2) Ordinarily the above-described transfer could result in income for the year of the transfer, depending on the transferor's basis, because legal services are received in exchange for the transfer. (3) In petitioner's case, 1990 was the year of transfer and 1994 the year of the recovery, but the open transaction doctrine causes the deferral of the gain to 1994 because the amount or value of the transfer was not determinable until the lawsuit settlement.

In a recent opinion, the Court of Appeals for the Eleventh Circuit followed the Cotnam holding that the contingent legal fees in Alabama are not includable in a taxpayer's gross income as part of the taxpayer's lawsuit recovery. See Davis v. Commissioner, supra. In that case, the Court of Appeals considered respondent's above-described alternative argument and rejected it for lack of proof that the "values of the properties exchanged" were sufficiently "unascertainable" to bring the open transaction doctrine into play. See id. at 1348. Likewise, the evidence in this case is insufficient to reach the question of whether respondent's alternative theory would change the result. Cf. id. at 1348 n.5.

The Court of Appeals for the Fifth Circuit's holding in Cotnam, as followed in Davis v. Commissioner, supra, applies in this case under the Golsen rule because petitioner's appeal of our decision would be to the Court of Appeals for the Eleventh Circuit. In that regard, decisions of the Court of Appeals for the Fifth Circuit prior to September 30, 1981, are binding precedent in the Court of Appeals for the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981).

That being the case, we hold for petitioner on this issue in accord with the holding of the Court of Appeals to which appeal of our decision would lie. Our longstanding practice, founded in Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445

F.2d 985 (10th Cir. 1971), is to follow the holding of a Court of Appeals where the facts are squarely on point.

There is no question that Alabama law applies to petitioner's contingent fee agreement, and respondent has not distinguished the facts here regarding the fee agreement from those in Cotnam or Davis.  Accordingly, we hold that petitioner is not required to include in gross income the portion of the recovery attributable to the legal fees.[4]

Section 6662

Respondent determined an accuracy-related penalty under section 6662 on that part of petitioner's deficiency that was attributable to negligence or an intentional disregard of rules or regulations.  Section 6662 permits the imposition of a 20-percent penalty on any portion of an underpayment of tax attributable to negligence or an intentional disregard of rules or regulations.  The term "negligence" includes any failure to make a reasonable attempt to comply with the statute, and the term "disregard" includes careless, reckless, or intentional disregard.  Sec. 6662(c).  Negligence also includes a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  See Ryback v. Commissioner, 91 T.C. 524, 565 (1988); Neely v. Commissioner, 85

---

[4] Here, the parties have both stated that the legal fee in question is in the amount of $2,519,000.

T.C. 934, 947 (1985). The penalty, however, is not imposed with respect to any portion of an underpayment for which there was reasonable cause and a taxpayer acted in good faith. See sec. 6664(c)(1).

On brief, respondent asserts that the only adjustments to which the negligence penalty applies are unreported interest and dividend income in the amounts of $1,996 and $3,488, respectively, and the amounts of $6,621 and $331,697, which are flow-through items from HGTG's bankruptcy estate. With respect to the interest and dividend items, petitioner conceded that the amounts were unreported, and he poses no defense with respect to his failure to report the same. With respect to the flow-through items from HGTG's bankruptcy estate, petitioner contends that he reasonably relied on his accountant, Gammon. Reasonable cause can be established if a taxpayer can show reasonable reliance on the advice of a competent and experienced accountant who prepared the return. See Weis v. Commissioner, 94 T.C. 473, 487 (1990).

Gammon had prepared petitioner's and petitioner's business entities' Federal income tax returns for almost 10 years at the time of the preparation of petitioner's 1994 Federal income tax return. Gammon was familiar with petitioner's business and financial matters. Gammon had prepared HGTG's returns and was familiar with its financial condition through the time that HGTG went into bankruptcy. After HGTG was in bankruptcy, Gammon was

not privy to HGTG's financial and/or tax information. Instead, those matters were within the jurisdiction of the trustee and others. Schedules K-1 were not received by petitioner or Gammon from the HGTG bankruptcy, and Gammon was not aware of the filing of any Federal income tax return until after the filing of petitioner's 1994 return. Both petitioner and Gammon were aware of the $557,257 settlement and attorney's fees and other deductions in the amounts of $224,156.25 and $1,419.88 that were connected with HGTG's portion of the resolution of the litigation. Even though Gammon was aware of the settlement, he believed that the losses and obligations of HGTG would cover and eliminate any taxable income that may have been realized from the settlement recovery.

Petitioner had no expertise with respect to Federal taxes and relied upon Gammon for all such matters. Petitioner did not understand the operation or mechanics of the bankruptcy proceeding. Under these circumstances we hold that it was reasonable for petitioner to rely on Gammon's judgment and advice with respect to the flow-through item. We are surprised that Gammon did not make inquiry of the bankruptcy trustee about any possible flow-through from HGTG to petitioner. Gammon's failure to inquire, considering petitioner's background and knowledge about such matters, does not make petitioner's reliance unreasonable. Accordingly, we hold that petitioner is not liable

for a section 6662 accuracy-related penalty with respect to the flow-through items from HGTG's bankruptcy.  With respect to the other items on which respondent asserted on brief that petitioner was liable for the penalty, petitioner has not provided a defense and accordingly has not shown respondent's determination on that issue is in error.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155.</u>