T.C. Memo. 2002-160


UNITED STATES TAX COURT


ESTATE OF MELVIN W. BALLANTYNE, DECEASED, JEAN S. BALLANTYNE,
INDEPENDENT EXECUTRIX, AND JEAN S. BALLANTYNE, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

RUSSELL E. BALLANTYNE AND CLARICE BALLANTYNE, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 14848-99, 16346-99.      Filed June 24, 2002.


<u>Kevin P. Kennedy</u>, for petitioners in docket No. 14848-99.

<u>Jon J. Jensen</u>, <u>Alexander F. Reichert</u>, and <u>Gary A. Pearson</u>,

for petitioners in docket No. 16346-99.

<u>John C. Schmittdiel</u> and <u>Roberta L. Shumway</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies in income

tax and a penalty in docket No. 14848-99 as follows:

| Taxpayer | Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|----------|------|------------|---------------------------------------|
| Jean S. Ballantyne | 1993 | $4,998 | -- |
| Estate of Melvin W. Ballantyne, Jean S. Ballantyne, Surviving Spouse | 1994 | 10,735 | -- |
| Estate of Melvin W. Ballantyne, Jean S. Ballantyne, Executrix | 1994 | 172,035 | -- |
| Estate of Melvin W. Ballantyne, Jean S. Ballantyne, Executrix | 1995 | 14,562 | $2,912 |

Respondent determined deficiencies in income tax and penalties in docket No. 16346-99 for Russell E. Ballantyne and Clarice Ballantyne as follows:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|------------|---------------------------------------|
| 1993 | $77,672 | -- |
| 1994 | 325,761 | $63,646.40 |
| 1995 | 47,381 | 9,476.20 |

In order to protect the Government from a potential whipsaw, respondent has taken inconsistent positions in these dockets.[1]

After concessions, the issues for decision are: (1) The proper allocation between the Estate of Melvin W. Ballantyne and petitioner Russell E. Ballantyne of gain from the sale of grain in 1994; (2) whether petitioner Russell E. Ballantyne had additional gain in 1994 in the amount of $751,988 which should

---

[1]These cases were consolidated for purposes of trial, briefing, and opinion.

have been included in gross income; and (3) whether petitioners
Russell E. Ballantyne and Clarice Ballantyne are liable for the
accuracy-related penalties pursuant to section 6662(a)[2] for 1994
and 1995 with respect to certain adjustments contained in the
notice of deficiency.

### FINDINGS OF FACT[3]

Some of the facts have been stipulated and are so found.
The stipulation of facts, the stipulations of settled issues, and
the attached exhibits are incorporated herein by this reference.
Petitioner Jean S. Ballantyne (Jean), who is the surviving spouse
of Melvin W. Ballantyne (Melvin) and the executrix for the Estate
of Melvin W. Ballantyne (the estate), resided in Minot, North
Dakota, at the time the petition in docket No. 14848-99 was
filed.  At that time, the estate was under the jurisdiction of

---

[2]Unless otherwise indicated, section references are to the
Internal Revenue Code in effect for the years in issue, and all
Rule references are to the Tax Court Rules of Practice and
Procedure.

[3]Russell and Clarice failed to comply with Rule 151(e)(3),
which requires that "In an answering or reply brief, the party
shall set forth any objections, together with the reasons
therefor, to any proposed findings of any other party, showing
the numbers of the statements to which the objections are
directed".  Under the circumstances, we have assumed that Russell
and Clarice do not object to respondent's or the estate's
proposed findings of fact except to the extent that their
statements on brief are clearly inconsistent therewith, in which
event we have resolved the inconsistencies on the basis of our
understanding of the record as a whole.  Estate of Jung v.
Commissioner, 101 T.C. 412, 413 n.2 (1993); Burien Nissan, Inc.
v. Commissioner, T.C. Memo. 2001-116 n.4.

Probate Court No. 1 in Bexar County, Texas. The business office for the estate is located in San Antonio, Texas. Petitioners Russell E. Ballantyne (Russell) and Clarice Ballantyne (Clarice) resided in Westhope, North Dakota, at the time they filed their petition.

Melvin Ballantyne and Russell Ballantyne were brothers. In 1943, they entered into an oral agreement whereby they formed a general partnership known as Ballantyne Brothers Partnership (BBP). Melvin and Russell were the only partners of BBP during its existence, and a written partnership agreement was never executed.

The partnership was involved in two separate and distinct business operations. Russell primarily conducted a farming activity in North Dakota. Russell's sons, Orlyn and Gary, assisted Russell in conducting the farming activity.[4] Melvin primarily conducted an oil and gas exploration and production activity in Canada and various U.S. locations. Melvin employed two of his sons, Stephen and Kab, to assist in conducting the oil and gas activity.[5] In general, Melvin and Russell allowed each other to withdraw from the partnership the profits attributable

---

[4]Russell and Clarice also had a daughter, Carolyn Ballantyne Backelsberg.

[5]Melvin and Jean had another son, Todd Ballantyne, who was involved in the oil and gas activity up until the mid-1970s. They also had two daughters, Jane Ballantyne Hegler and Sue Ballantyne.

to the respective activity each brother primarily conducted. Melvin and Russell generally paid the expenses related to the respective activity each conducted. Many of the assets used by BBP in its activities were not held in the partnership's name. Rather, these assets were either jointly owned by Melvin and Russell or individually owned by one of them.

In late 1993 or early 1994, Melvin was diagnosed with pancreatic cancer, and he subsequently died on March 4, 1994. The partnership automatically dissolved upon Melvin's death. In the months leading up to Melvin's death, some of the assets of BBP were equally distributed between Melvin (or his children) and Russell. At the time of Melvin's death, Jean, Stephen, Kab, and Todd believed that Melvin and Russell were equal partners in BBP.

For at least the taxable years 1980 through 1994, BBP filed Forms 1065, U.S. Partnership Return of Income. Jules Feldmann (Mr. Feldmann), a certified public accountant, prepared BBP's Federal income tax returns for those years.[6] Melvin, Stephen, and Kab provided Mr. Feldmann with financial information about the oil and gas activity. Russell, Orlyn, and Gary provided Mr. Feldmann with financial information about the farming activity. The Forms 1065 for 1980 through 1994 reported that Melvin and

---

[6]Mr. Feldmann also regularly prepared personal income tax returns for Melvin and Russell for several years. Mr. Feldmann prepared Melvin's return for 1993 and Russell and Clarice's returns for the years in issue.

Russell each were general partners in BBP and that they each held a 50-percent interest in the profit sharing, loss sharing, and ownership of capital of the partnership. Additionally, Melvin and Russell each reported 50-percent of BBP's income, gain, loss, deduction, and credit on their individual Federal income tax returns.

For the taxable year 1994, BBP's gross income from the farming activity totaled $1,503,976.58. This amount was attributable to grain sales by BBP to Bottineau Farmers Elevator (Bottineau). The grain sold in 1994 was grown in prior years and was an asset of BBP. The following schedule lists the payments made by Bottineau in 1994 for the grain:

| Date | Payee | Amount |
|------|-------|--------|
| 1/03/94 | Ballantyne Bros. | $821,565.32 |
| 1/17/94 | Ballantyne Bros. | 250,000.00 |
| 2/28/94 | Russell Ballantyne | 104,181.18 |
| 3/04/94 | Russell Ballantyne | 59,238.79 |
| 3/18/94 | Ballantyne Bros. | 121,816.80 |
| 10/18/94 | Ballantyne Bros. | 73,993.25 |
| 10/18/94 | Jean Ballantyne | 73,181.24 |
| Total | | 1,503,976.58 |

On the Schedule F, Profit or Loss from Farming, attached to its 1994 Form 1065, BBP reported depreciation and other farm expenses of $371,294, resulting in a net farm profit of $1,132,681. On its Form 1065, BBP reported additional income of $144,046 from oil revenues, resulting in total income of $1,276,727. After accounting for miscellaneous deductions, BBP reported ordinary income of $1,242,710 from trade or business activities. BBP also

reported net oil royalty income from Canada of $300,115 and foreign taxes paid in the amount of $182,608. The Schedules K-1, Partner's Share of Income, Credits, Deductions, Etc., issued to the estate and Russell allocated to each, as distributive share items, one-half of partnership ordinary income, gross farming income, oil revenue income, and oil royalty income from Canada.[7]

On a Schedule E, Supplemental Income and Loss, attached to his 1994 Form 1040, U.S. Individual Income Tax Return, Russell reported ordinary income of $584,122 from BBP.[8] On a Schedule E attached to its 1994 Form 1041, U.S. Income Tax Return for Estates and Trusts, the estate reported ordinary income of $616,423 from BBP.[9]

During its existence, BBP did not maintain a general ledger, a balance sheet, a sales journal, or a purchases journal. BBP

---

[7]The 1994 Form 1065, U.S. Partnership Return of Income, also reported investment income of $13,428 and charitable contributions of $275. These items were allocated evenly between the estate and Russell.

[8]Attached to the 1994 Form 1040, U.S. Individual Income Tax Return, was a supplemental statement titled "Schedule E - Supplemental Information", which showed ordinary income from BBP of $621,355, less "depletion cost percentage" totaling $37,233, resulting in the amount of $584,122 listed on Schedule E.

[9]Attached to the 1994 Form 1041, U.S. Income Tax Return for Estates and Trusts, was a supplemental statement titled "FLOW-THRU DETAIL REPORT-FORM 1065", listing income from BBP of $621,355. A depletion deduction of $4,932 was listed on the supplemental statement. This amount was deducted from the income listed on the Form 1041 and resulted in the total of $616,423 listed on the Schedule E.

did not always maintain a cash disbursements journal or a cash receipts journal. Mr. Feldmann was never provided with a complete listing of BBP's assets and liabilities, and he never prepared a balance sheet for the partnership.[10] Neither the partnership nor Mr. Feldmann prepared yearend trial balances. Partnership capital accounts for BBP were never maintained. The 1993 and 1994 Forms 1065 reported that Melvin and Russell had balances of "0" in their respective capital accounts at both the beginning and the end of those taxable years.[11] On the 1993 and 1994 Forms 1065, BBP reported on the Schedules L, Balance Sheet, that the total assets and total liabilities of the partnership at the beginning and the end of those taxable years were "None".[12] A calculation of each partner's capital contributions to the partnership cannot be made given the state of BBP's records. Additionally, a calculation of the distributions made to each

_____

[10]In the mid-1980s, Mr. Feldmann recommended that BBP maintain a balance sheet showing the partnership's assets and liabilities.

[11]For the taxable years 1980 through 1992, the areas designated on the Forms 1065 and Schedules K-1, Partner's Share of Income, Credits, Deductions, Etc., attached to the Forms 1065 pertaining to information concerning Melvin's and Russell's respective capital accounts were left blank. For the taxable years 1993 and 1994, the Forms 1065 were also left blank; however, the Schedules K-1 listed the amounts in Melvin's and Russell's respective capital accounts at the beginning and end of those taxable years as "0". Russell signed BBP's partnership tax returns for the years 1993 and 1994.

[12]For the taxable years 1980 through 1992, the Schedules L, Balance Sheet, on BBP's Forms 1065 were left blank.

partner cannot be made. The partnership tax returns for the years 1980 through 1994 reflect that the oil and gas activity was more profitable overall than the farming activity during that period.

After Melvin's death, a dispute arose concerning BBP. On April 19, 1995, Jean, individually and in her capacity as independent executrix of the estate, filed suit against Russell and other parties. The original and amended petitions sought, among other things, an accounting of the assets and liabilities of BBP in order to establish the value of BBP's assets and liabilities and the respective interests of Melvin and Russell as of the date of Melvin's death. The dispute was also outlined in the estate's 1994 Form 1041. On a Form 4684, Casualties and Thefts, attached to the 1994 Form 1041, the estate reported a casualty/theft loss of $560,900. In an attachment to the Form 4684, the estate alleged that Russell had embezzled cash from BBP bank accounts and transferred it to his own business and personal accounts, resulting in a casualty/theft loss of $560,900. The estate further alleged:

> A portion of the amount of cash embezzled from the
> partnership in 1994 has been ascertained from the
> partnership tax return. The estate received its 50%
> portion of the income distributions for oil properties
> in the U.S. and Canada. The Estate has not received
> its 50% of the distribution from the farm operations
> because Russell Ballantyne, the general partner has
> taken the money.

The loss calculation for 1994 is calculated as follows:

| | |
|---|---:|
| Net farm revenues | $1,132,681 |
| add: depreciation | 135,317 |
| less: distribution (10/94) | (147,174) |
| Interest income | 13,057 |
| Interest expense | (12,082) |
| Total cash embezzled | $1,121,799 |
| 50% Share | $ 560,900 |

On both its original and amended Forms 1041 for the taxable year 1995, the estate claimed that as a result of Melvin's death it acquired a 50-percent interest in BBP. In a document attached to both the original and amended Forms 1041, the estate made the following statement:

> [The estate] acquired a 50% interest in Ballantyne Brothers on March 4, 1994 as a result of the death of Melvin Ballantyne. The interest in the partnership was valued at $731,509 on the 706.

> On March 4, 1994, the assets of Ballantyne Brothers consisted of cash, marketable securities, notes receivable, oil and gas properties, office furniture and fixtures, farm inventory, seed, buildings and equipment having a fair market value of $1,463,019. Taxpayer has been unable to obtain the basis amounts for these assets. Currently there is legal action against the partnership to obtain such information.

On August 24, 1998, a settlement agreement was executed which resolved the dispute concerning BBP. In negotiating the settlement, representatives of the estate relied on the advice of a certified public accountant as to the value of BBP's assets. The goal of the estate's representatives was to obtain 50 percent in value of the partnership's assets. Under the settlement

agreement, Russell agreed to transfer $2 million to the estate to be deposited in a trust account to be held in trust for the benefit of the estate pending the execution of certain releases attached to the settlement agreement. All interests in oil properties held on March 4, 1994, by BBP and/or Melvin or Russell, individually, jointly, or as tenants in common, were divided equally between the estate and Russell. Various bank and stock accounts held in the name of BBP and Melvin and Russell were to be closed within 30 days with the assets' being distributed equally between the estate and Russell.[13] All debts owed by Verde Oil Company to BBP on or after March 4, 1994, were assigned to the estate. The estate agreed to drop its embezzlement loss claim against Russell, and the parties stipulated that all grain, and any proceeds therefrom, held on or after November 1993 in the name of BBP were to be the sole property of Russell. Finally, the parties stipulated that, subject to the terms and conditions stated in the settlement agreement and stipulations of ownership, all assets and liabilities of BBP held on or after March 4, 1994, would be the sole property of Russell.

After Melvin's death, Mr. Feldmann received information regarding the oil and gas activity primarily from Carolyn

---

[13]Title and possession of three vehicles were transferred from BBP to Jean Ballantyne.

Ballantyne Backelsberg (Carolyn), Russell and Clarice's daughter. For the taxable year 1995, Carolyn provided Mr. Feldmann with information regarding intangible drilling costs (IDCs) paid by Russell in the taxable year 1995. A portion of the IDCs deducted by Russell in 1995 had actually been reimbursed to him by Ballantyne Oil and Gas, Inc. during that year. Mr. Feldmann was not informed that Russell had been reimbursed for approximately $97,790 of those expenses. The amount Russell claimed as a Schedule E deduction for production taxes in the taxable year 1995 was based on the information provided to Mr. Feldmann.

On June 16, 1999, respondent issued notices of deficiency to the estate for its taxable years 1994 and 1995. In addition to other adjustments, respondent disallowed the estate's claimed theft loss of $560,900 in 1994 on the grounds that the estate had not established (1) there was a theft loss and (2) the theft loss was the estate's to claim. In its petition, the estate alleged that respondent erred in increasing its income by $560,900 because that amount was the income of Russell and was not taxable to the estate.

On July 21, 1999, respondent issued a notice of deficiency to Russell and Clarice for their taxable years 1993, 1994, and 1995. In addition to other adjustments, respondent increased Russell and Clarice's gross income for 1994 by $751,988. Respondent identified this adjustment under the heading "ORDINARY

INCOME (WHIPSAW)" and stated that "We have adjusted your gross income to include amounts received for grain income for $751,988.00 in 1994." No further explanation was provided. Respondent also determined that Russell and Clarice were liable for the accuracy-related penalties pursuant to section 6662(a) for 1994 and 1995 with respect to certain adjustments contained in the notice of deficiency. These adjustments included the increase in gross income for grain income, issues subsequently conceded by Russell and Clarice relating to oil and gas activities, and an issue subsequently conceded by respondent relating to certain royalty income.

In their petition, Russell and Clarice alleged that respondent "erroneously included within the taxpayers' gross income grain income in the amount of $751,988 for the tax year 1994". In his answer, respondent denied this allegation but did not elaborate on the reason for the inclusion of the additional amount in gross income.

## OPINION

The primary issue in this case involves the proper allocation between the estate and Russell of the grain sales income for 1994. Respondent has protected the Government from a potential whipsaw by taking inconsistent positions in his notices of deficiency. Respondent's primary argument is that the estate and Russell are each liable for income tax on their respective

50-percent distributive shares of income from BBP in 1994 from the sale of grain. Alternatively, respondent contends that the grain sold in 1994 was owned solely by Russell, and, thus, he had additional gross income of $751,988 in 1994. Respondent also argues that, to the extent the distribution of grain sales proceeds and other money to Russell exceeded his adjusted basis in BBP, Russell had gain on the distribution pursuant to section 731(a). Finally, respondent contends that Russell and Clarice are liable for the accuracy-related penalties for 1994 and 1995 with respect to the grain sales income item and certain erroneous deduction items.

Russell contends that he is responsible for only 50 percent of the income tax on the grain sales income for 1994 because he and Melvin agreed to share equally all the income and expenses of BBP. Russell relies on the fact that tax returns filed by BBP for the taxable years 1980 through 1994 show that all the income and expenses were shared equally by the partners for income tax purposes. Russell also contends that he possessed sufficient basis to withdraw the cash from the grain sales without incurring any additional tax liability. Finally, Russell and Clarice claim that they are not liable for the accuracy-related penalties for

1994 and 1995 because they relied in good faith on the advice of their accountant.[14]

The estate argues that all grain sales income is attributable to Russell because he was entitled to receive all the farm income as his distributive share of BBP income.[15] In its reply brief, the estate for the first time joins respondent's alternative argument that the grain was the sole property of

---

[14]On brief, Russell and Clarice argue that sec. 7491 applies and that respondent has the burden of proof with respect to the issues for decision. In certain circumstances, if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the proper tax liability, sec. 7491 places the burden of proof on respondent. Sec. 7491(a); Rule 142(a)(2). Sec. 7491(c) operates to place the burden of production on respondent in any court proceeding with respect to the liability of the taxpayer for penalties and additions to tax. Sec. 7491 is effective with respect to court proceedings arising in connection with examinations commencing after July 22, 1998. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727. Russell and Clarice have introduced no evidence to establish whether the examination in this case commenced after July 22, 1998, and, consequently, they have failed to show that sec. 7491 applies. Eddie Cordes, Inc. v. Commissioner, T.C. Memo. 2001-265. We note that the evidence that is in the record establishes that the examination of the estate, as well as an examination of BBP, began before July 23, 1998.

[15]We note that the estate, in arguing that Melvin's and Russell's distributive shares were the profits from the respective activity each conducted, has not discussed the fact that this finding would mean that the estate should have reported 100 percent of the income from the oil and gas activity instead of only 50 percent of the income. It appears that the estate is arguing that it should be liable for only 50 percent of the income from the oil and gas activity and no portion of the income from the farming activity. This conflicts with the estate's primary argument that its distributive share was the profits from the oil and gas activity.

Russell.  Alternatively, the estate argues that the grain sales income is attributable to Russell because he received it under a claim of right and without any restriction on his right to dispose of the income.

## I.  Ownership of Grain at Time of Sale

Initially, we must decide whether the grain sold in 1994 was owned by Russell or BBP.  If the grain sold in 1994 was owned solely by Russell and was not partnership property, then he will be liable for any tax attributable to the entire amount of grain sales proceeds in 1994.

The grain that was sold in 1994 was grown in prior years and was an asset of BBP.  The parties do not dispute that the grain was part of the farming activity which was an operation of BBP.  BBP's 1994 Form 1065 reported the grain sales gain as income to the partnership and the estate and Russell each were allocated one-half of the gain.  The estate and Russell each reported one-half of the grain sales income on their respective 1994 tax returns.

In the settlement agreement signed August 24, 1998, it was stipulated that all grain proceeds held on or after November 1993 in the name of BBP were the sole property of Russell.  Handwritten notes of Stephen Ballantyne, dated August 23, 1998, and entitled "Plaintiff's Settlement Proposal", state that the plaintiffs "need to word agreement so that Estate will not pay

taxes on the 1994 K-1" and "word that cash is estate's share of
ptnrsp [sic]".  The evidence in the record reflects that, at the
time the grain sales were made in 1994, the grain was owned by
BBP.  It was not until the settlement agreement in 1998 that the
grain was labeled as the sole property of Russell.  It is well
settled that taxpayers lack the privilege of retroactively
allocating between themselves tax obligations owed to the United
States.  United States v. Little, 753 F.2d 1420, 1430 (9th Cir.
1984); Moore v. Commissioner, 70 T.C. 1024, 1032 (1978); Curtis
v. Commissioner, T.C. Memo. 1995-344; Jacobellis v. Commissioner,
T.C. Memo. 1988-315; see also Pesch v. Commissioner, 78 T.C. 100,
128-129 (1982); Bonner v. Commissioner, T.C. Memo. 1979-435 ("an
agreement to which respondent is not a party cannot force him to
collect taxes from someone other than the person upon whom taxes
are imposed" (citing Neeman v. Commissioner, 13 T.C. 397 (1949),
affd. per curiam 200 F.2d 560 (2d Cir. 1952))).  On the basis of
the evidence in the record, we hold that the grain sold in 1994
was BBP's property and that the income from the grain sales was
therefore BBP's.  We now turn to the question of the proper
allocation between the estate and Russell of the partnership
income from the grain sales in 1994.

II.  Allocation of Gain From Sale of Grain

A partner must take into account his "distributive share" of
each item of partnership income, gain, loss, deduction, and

credit, when determining his income tax.  Sec. 702(a); <u>Vecchio v. Commissioner</u>, 103 T.C. 170, 185 (1994).  Each partner is taxed on his distributive share of partnership income regardless of whether the amount is actually distributed to him.  <u>United States v. Basye</u>, 410 U.S. 441, 454 (1973) ("Few principles of partnership taxation are more firmly established than that no matter the reason for nondistribution each partner must pay taxes on his distributive share."); <u>Vecchio v. Commissioner</u>, <u>supra</u> at 185; sec. 1.702-1(a), Income Tax Regs.  A partner's distributive share of income or loss is generally determined by the partnership agreement.  Sec. 704(a).   The partnership agreement may be written or oral.  <u>Stern v. Commissioner</u>, T.C. Memo. 1984-383; sec. 1.761-1(c), Income Tax Regs.  In the case of an oral partnership agreement, all the facts and circumstances surrounding the formation and operation of the partnership are relevant in determining the sharing ratios of the partners. <u>Barron v. Commissioner</u>, T.C. Memo. 1992-598; <u>Hogan v. Commissioner</u>, T.C. Memo. 1990-295 n.7; <u>Reed v. Commissioner</u>, T.C. Memo. 1978-58; <u>Ryza v. Commissioner</u>, T.C. Memo. 1977-64.  If the partnership agreement does not provide as to a partner's distributive share, or if the partnership agreement provides for an allocation that does not have substantial economic effect, then a partner's distributive share is determined by the partner's "interest in the partnership."  Sec. 704(b).

Determinations of substantial economic effect, as well as determinations of a partner's interest in the partnership, are dependent upon an analysis of the partners' capital accounts. Interhotel Co., Ltd. v. Commissioner, T.C. Memo. 2001-151.

A.   Partnership Agreement and Substantial Economic Effect

The estate argues that the oral partnership agreement was that Russell's distributive share was the income or loss from the farming activity, and Melvin's distributive share was the income or loss from the oil and gas activity.  Russell and respondent argue that the oral partnership agreement was that Russell's and Melvin's distributive shares were equal but that each brother was entitled to draw from the profits of the activity he operated.

As explained below, either a 50-percent allocation (as advocated by Russell and respondent) or an allocation based on the profits of the respective activities (as advocated by the estate) lacks substantial economic effect and, therefore, the distributive shares must be determined in accordance with the partners' interest in BBP.  Thus, regardless of whether the partnership agreement contained an allocation of items and what that allocation was, the partners' distributive shares are to be determined in accordance with the partners' interests in the partnership.

If the partnership agreement provides for the allocation of income, gain, loss, deduction, or credit (or item thereof) among

partners, then the allocation will be recognized provided it has substantial economic effect.[16]  Sec. 1.704-1(b)(1)(i), Income Tax Regs.  Substantial economic effect requires that (1) the allocation have economic effect and (2) such effect is substantial.  Sec. 1.704-1(b)(1)(i) and (2), Income Tax Regs.

An allocation has economic effect if, and only if, throughout the full term of the partnership, the partnership agreement provides: (1) The partners' capital accounts be kept in accordance with the regulations; (2) liquidating distributions be made in accordance with positive capital account balances; and (3) a partner must be required to restore a deficit capital account balance following the liquidation of the partnership or of his interest in the partnership.  Vecchio v. Commissioner, supra at 189; sec. 1.704-1(b)(2)(ii)(b), Income Tax Regs.  An allocation does not have economic effect if it fails to satisfy any of the three parts of the test.  Vecchio v. Commissioner, supra at 189.  In the instant case, capital accounts were never maintained; thus, the proffered allocations fail the economic effect test.

The regulations under section 704 also provide an alternate test for economic effect, contingent on satisfaction of requirements (1) and (2) above.  Sec. 1.704-1(b)(2)(ii)(d),

---

[16]The "substantial economic effect" test is applicable to all partnership allocations, not just "special allocations". Hogan v. Commissioner, T.C. Memo. 1990-295.

Income Tax Regs. BBP does not meet requirements (1) and (2) because BBP did not maintain any capital accounts. Thus, the proffered allocations fail the alternate test for economic effect.

Allocations which fail the economic effect test may be deemed to have economic effect if they pass the economic effect equivalence test. In Vecchio v. Commissioner, supra at 192, we stated:

> Allocations made to a partner that do not otherwise satisfy the economic effect test, nevertheless, are deemed to have economic effect, provided that, as of the end of each partnership taxable year, a liquidation of the partnership at the end of such year or at the end of any future year would produce the same economic results to the partners as would occur if all the requirements of the economic effect test had been satisfied, regardless of the economic performance of the partnership. Sec. 1.704-1(b)(2)(ii)(i), Income Tax Regs.; see also Elrod v. Commissioner, 87 T.C. 1046, 1086 n.23 (1986). * * *

None of the parties have argued or demonstrated that either of the proffered allocations satisfies this economic effect equivalence test.

As mentioned earlier, where the partnership agreement does not provide as to a partner's distributive share, or where the partnership agreement provides for an allocation that does not have substantial economic effect, a partner's distributive share is determined by the partner's "interest in the partnership." Sec. 704(b). As stated above, the allocations proposed by the parties lack economic effect. Thus, the gain from the grain

sales must be allocated in accordance with the partners'
interests in BBP.

We note that the estate relies on the following language in
Boynton v. Commissioner, 72 T.C. 1147 (1979), affd. 649 F.2d 1168
(5th Cir. 1981), to support its position and define the term
"distributive share":

> However, the power of the partners to fix their overall
> "distributive" shares is subject to another and more
> sweeping limitation, namely, that the purported
> allocations of income and losses nominally made in the
> partnership agreement must be bona fide in the sense
> that they are genuinely in accord with the actual
> division of profits and losses inter sese which the
> partners have in fact agreed upon among themselves.
> Thus, if provisions of the partnership agreement itself
> effectively spell out how the profits are required to
> be divided and how the losses are required to be borne,
> the "distributive" shares of the partners will be
> determined in accordance with such provisions, rather
> than by an artificial label in the agreement which
> characterizes as "distributive" an entirely different
> allocation of profits and losses, and which has meaning
> in terms of the partnership agreement only in respect
> of the partners' liability to the Internal Revenue
> Service.  This does not mean that the partners are
> precluded from fixing their distributive shares in any
> manner they choose.  What it does mean is that in
> construing the partnership agreement, the formula which
> they select for actually dividing profits and
> apportioning losses among themselves will be
> determinative of their "distributive" shares, rather
> than a different formula arbitrarily included in the
> agreement which is to be applicable only for the
> purpose of filing income tax returns, and which is to
> have no legal consequences in respect of their rights
> against one another.  In short, where one provision of
> the agreement which purports to characterize as
> "distributive" a certain division of profits and losses
> is contradicted by another provision which legally
> fixes the rights of the partners inter sese, it is the
> latter provision, rather than the former, which
> establishes the "distributive" shares of the partners

within the meaning of the statute. The overriding principal is sometimes referred to as the doctrine of "substance over form," or is alternatively described as the "economic substance" test. See, e.g., 1A. Willis, Partnership Taxation, sec. 25.11, pp. 316-319 (1976). [Boynton v. Commissioner, supra at 1158-1159.]

Our decision in Boynton v. Commissioner, supra, dealt with section 704(b) as in effect in 1974. As in effect at that time, and as interpreted in Boynton, section 704(b) generally provided that if the partnership agreement did not provide as to the partners' distributive shares, or the principal purpose of any provision of the partnership agreement with respect to the partners' distributive share of the item was avoidance or evasion of tax described in that subtitle, then the partners' distributive shares were determined with reference to each partner's agreed-upon share of the economic profits and losses, not the basis upon which the partners might agree to report income or claim losses on their individual returns. Boynton v. Commissioner, supra at 1157 n.12, 1159. Section 704(b) was subsequently amended for taxable years beginning after December 31, 1975, and now provides that if the partnership agreement does not provide as to the partners' distributive shares, or the allocations to the partners under the partnership agreement lack substantial economic effect, then the partners' distributive shares will be determined in accordance with the partners' interests in the partnership. Sec. 704(b); Tax Reform Act of 1976, Pub. L. 94-455, sec. 213(d), 90 Stat. 1548. Thus, in the

instant case, the statute currently requires that the partners' distributive shares be determined in accordance with the partners' interests in the partnership. We note that the regulations promulgated under current section 704(b) provide that among the factors to be considered is the partners' interests in the economic profits and losses of the partnership. Sec. 1.704-1(b)(3)(ii)(b), Income Tax Regs.[17]

B.    Partners' Interests in the Partnership

All partners' interests in the partnership are presumed to be equal. Sec. 1.704-1(b)(3)(i), Income Tax Regs. This presumption may be rebutted upon the establishment of facts and circumstances that the partners' interests in the partnership are otherwise. Id. A "partner's interest in the partnership" is defined as the "manner in which the partners have agreed to share the economic benefit or burden (if any) corresponding to the income, gain, loss, deduction, or credit (or item thereof) that

---

[17]The final regulations promulgated under sec. 704(b) were filed on Dec. 24, 1985, and published on Dec. 31, 1985. T.D. 8065, 1986-1 C.B. 254. The final regulations are effective generally for partnership taxable years beginning after Dec. 31, 1975. For partnership taxable years beginning after Dec. 31, 1975, but before May 1, 1986 (or before Jan. 1, 1987, with respect to special allocations of nonrecourse debt), however, a special allocation that does not satisfy the requirements nevertheless will be respected for purposes of the final regulations if the allocation has substantial economic effect as interpreted under the relevant caselaw and the legislative history of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520. Sec. 1.704-1(b)(1)(ii), Income Tax Regs.; see also Elrod v. Commissioner, 87 T.C. 1046, 1086 n.23 (1986); Hogan v. Commissioner, T.C. Memo. 1990-295 n.8.

is allocated." Sec. 1.704-1(b)(3)(i), Income Tax Regs. All facts and circumstances relating to the economic arrangement of the partners are taken into account. Id. The following factors are considered relevant in determining a partner's interest in the partnership: (1) The partners' relative contributions to capital; (2) the partners' interests in economic profits and losses; (3) the partners' interests in cashflow and other nonliquidating distributions; and (4) the rights of the partners to distributions of capital upon liquidation of the partnership. Sec. 1.704-1(b)(3)(ii), Income Tax Regs.

The first factor to consider is the partners' relative contributions to capital. Melvin and Russell formed BBP in 1943, and the partnership became involved in an oil and gas activity and a farming activity. In general, Melvin paid the expenses related to the oil and gas activity, while Russell did the same with respect to the farming activity. Many of the assets used by BBP in its activities were not held in the partnership's name. Rather, these assets were either jointly owned by Russell and Melvin or individually owned by one of them. During its existence, BBP did not maintain a general ledger, a balance sheet, a sales journal, or a purchases journal. BBP did not always maintain a cash disbursements journal or a cash receipts journal. Partnership capital accounts for BBP were never maintained. A calculation of each partner's capital

contributions to the partnership cannot be made given the state of BBP's records. Thus, the evidence in the record is insufficient to determine the partners' relative contributions to capital.

The second factor to consider is the partners' interests in the economic profits and losses of the partnership. Melvin and Russell generally allowed each other to withdraw the profits from the respective activity each brother primarily conducted. Both Russell and Mr. Feldmann testified that they believed that Melvin withdrew more money from BBP over the years than Russell did. Russell testified that he and Melvin had a great working relationship and that they agreed that they would report the income and loss from BBP equally on both the partnership and their individual income tax returns. Russell testified that the amount of income from each activity varied because sometimes the price of grain was good and other times the price of oil was good. The amount of profits earned by each activity varied year to year depending on various factors, including the market prices for grain or oil. For the taxable years 1980 through 1994, the evidence in the record reflects that the oil and gas activity was more profitable overall than the farming activity during this period. The profits and losses varied from year to year as between the two activities, and the evidence in the record is insufficient from which to define the partners' interests in the

partnership according to any arbitrary percentage of the profits or losses of the entire partnership.

The third factor to consider is the partners' interests in cashflow and other nonliquidating distributions. In general, Melvin and Russell agreed to allow each other to withdraw the portion of proceeds generated by their respective activities. The evidence in the record indicates that different bank accounts were maintained for the two activities, with Melvin primarily in charge of the oil and gas accounts and Russell primarily in charge of the farm accounts. Russell testified that he wrote checks on the BBP farm account as he needed the money, not as the income was received by BBP. He further testified that although he felt he was entitled to farm income, there was nothing that prohibited Melvin from writing a check from the BBP farm account and that if Melvin wanted money from the farming activity then Russell would write him a check. Russell testified that Melvin stated several times that he would take $200,000 a month out of BBP. Russell believed that this amount was more than Russell withdrew from the partnership. Additionally, Russell and Mr. Feldmann both testified that over the life of the partnership, Melvin probably withdrew more money from the partnership than Russell did.[18]

_____

[18]We note that, with respect to the grain sales made in 1994, Jean Ballantyne was listed as the payee for a $73,181.24

(continued...)

As mentioned earlier, BBP did not maintain a general ledger, a balance sheet, a sales journal, or a purchases journal. The partnership did not always maintain a cash disbursements journal or a cash receipts journal. A calculation of the distributions made to each partner over the years cannot be made given the state of BBP's records. However, we note that the parties agree that each partner generally withdrew funds from the respective activity he conducted, and our review of BBP's tax returns for the years 1980 through 1994 indicates that the oil and gas activity was more profitable overall than the farming activity during this period. Additionally, in the months before Melvin's death, some of the assets of BBP were equally distributed between Melvin (or his children) and Russell.

The fourth factor to consider is the partners' rights to distributions of capital upon liquidation of the partnership. At trial, all the witnesses testified that, prior to Melvin's death, they believed that Melvin and Russell shared in the partnership equally. Stephen testified that, as of Melvin's date of death, he believed that BBP was a 50-50 partnership. He further testified that he believed this because Melvin and Russell each

_____

[18](...continued)
payment made on Oct. 18, 1994. Russell Ballantyne was listed as the payee for two payments totaling $163,419.97. The remaining payments were made to BBP. Thus, it appears that a portion of the farm income for 1994 was paid directly to Jean, either to her personally or on behalf of the estate.

had 50-percent ownership in land.  Jean testified that, although she generally did not discuss business with Melvin, she "just thought that everything was 50-50" in BBP.  Kab testified that, at the time of Melvin's death, he believed that Melvin and Russell shared BBP profits on an equal basis.  Todd testified that he understood that Melvin and Russell had an agreement that all property was owned equally and income taxes were split evenly.  After Melvin's death, a dispute arose concerning BBP.  The parties eventually negotiated a settlement agreement resolving the dispute concerning BBP.  In negotiating the settlement agreement, the goal of the estate's representatives was to obtain 50 percent in value of the partnership assets.  The parties stipulated that the grain income was the sole property of Russell; however, Russell was also required to pay $2 million to be held in trust for the benefit of the estate.  The evidence in the record indicates that the remaining assets and liabilities of BBP were split approximately equally between the estate and Russell.  Thus, the evidence generally indicates that each partner had equal rights to distributions of capital upon liquidation of BBP.

In addition to the four factors above, we also note that other evidence bears on the partners' interests in BBP.  For at least the years 1980 through 1994, BBP reported all partnership items equally, and a dispute never arose as to the proper

allocation of items until after Melvin died.[19] The testimony at trial indicated that all witnesses believed that Melvin and Russell had a close relationship and shared equally in partnership items. In fact, the estate's original and amended Forms 1041 for 1994 and 1995 reflect the estate's belief that it acquired a 50-percent interest in BBP as a result of Melvin's death.[20] No evidence was presented suggesting that either brother had a problem with the partnership arrangement or the way partnership items were reported. Each brother appeared to have been content with the equal reporting arrangement and held himself out as owning an equal interest in the partnership. The tax returns for the years 1980 through 1994 indicate that in some years the income from the oil and gas activity was more than the income from the farming activity and vice versa.

All partners' interests in a partnership are considered equal. Sec. 1.704-1(b)(3)(i), Income Tax Regs. It is undisputed

---

[19]Consistent with allocations reported on BBP's partnership returns, Melvin and Russell reported one-half of partnership items on their individual Federal income tax returns. This Court has previously recognized that statements made in a Federal tax return are generally considered an admission by the taxpayer and will not be overcome without cogent evidence that they are wrong. Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989); Lare v. Commissioner, 62 T.C. 739, 750 (1974), affd. without published opinion 521 F.2d 1399 (3d Cir. 1975); Gale v. Commissioner, T.C. Memo. 2002-54.

[20]The estate's amended Form 1041 for 1995 was stamped received by the Internal Revenue Service in Austin, Texas, on Mar. 7, 1997, more than 3 years after the date of Melvin's death.

that Melvin and Russell agreed to report all items of BBP equally for Federal income tax purposes. The brothers adhered to this agreement throughout the existence of the partnership, and the evidence in the record reflects that neither brother objected to the arrangement. There is no evidence to indicate that either Melvin or Russell was attempting to divide profits and apportion losses solely to avoid undesirable tax consequences. Mr. Feldmann, who regularly prepared BBP's partnership returns as well as Melvin's and Russell's individual returns, testified that it was his understanding that Melvin and Russell had an oral agreement that they were equal partners in BBP and they each had 50-percent distributive shares. After considering all the facts and circumstances relating to the economic arrangement of Melvin and Russell, including the four factors listed in section 1.704-1(b)(3)(ii), Income Tax Regs., we conclude that each partner had a 50-percent interest in BBP. Accordingly, the gain from the sale of grain in 1994 must be allocated equally between the estate and Russell.

C.  Whether the Estate Can Avoid Reporting Grain Sales Income in 1994 If Russell Received the Entire Grain Sales Income Under a Claim of Right

The estate argues that all the gain from the sale of grain in 1994 is attributable to Russell because he received it under a claim of right and without any restriction on his right to dispose of the income. The estate cites Estate of Kahr v.

Commissioner, 48 T.C. 929 (1967), affd. in part and revd. in part on another issue 414 F.2d 621 (2d Cir. 1969), and Estate of Etoll v. Commissioner, 79 T.C. 676 (1982), to support its argument that Russell should have included all the farm income in his gross income for 1994 and that none of the farm income is includable in the gross income of the estate for 1994.  Respondent argues that regardless of whether the claim of right doctrine applies and whether Russell received the grain sales income under the claim-of-right doctrine, the estate is not relieved from reporting one-half of the gain from the grain sales.[21]

In Estate of Kahr v. Commissioner, supra, the taxpayer, a 50-percent interest holder in a partnership, diverted large amounts of partnership income from the partnership to himself. Id. at 930.  The taxpayer did not report the diverted funds in the partnership returns of the company.  Id. at 931.  The Commissioner determined that the taxpayer was liable for income tax on one-half of the amount of the diverted funds as his distributive share of partnership income and that he was taxable on the other half of the amount of the diverted funds as embezzlement income.  Id. at 933.  We held that the taxpayer

---

[21]Respondent has not asserted that Russell is required to include the gain from the grain sales in 1994 under the claim of right doctrine.  Respondent's contention that Russell is liable for income tax on the entire amount of grain sales income is only on the grounds that (1) the grain was the sole property of Russell or (2) Russell received distributions in excess of his basis in his partnership interest.

"embezzled company funds in the amounts determined, and it is the law that embezzled funds are income to the embezzler in the year in which they are misappropriated." Id. at 934. We did not explain whether our holding was based on the reasoning that all the diverted funds were income to the taxpayer as embezzled funds, or whether one-half was income to the taxpayer as his distributive share and the other half was income as embezzled funds.

In Estate of Etoll v. Commissioner, supra, three partners, one of whom was the taxpayer, were engaged in a partnership. The partnership was a successor to another partnership which had operated under an agreement containing a provision that all assets, including accounts receivable, would become the property of the taxpayer upon the partnership's dissolution. Id. at 676-677. A new partnership agreement was prepared and contained a different provision in respect of the distribution of the assets upon dissolution. Id. at 677. However, that agreement was never executed by one of the partners and never became effective. Id. Subsequently, the partnership dissolved, and the taxpayer collected partnership accounts receivable and used a portion to pay personal expenses and deposited a portion into a bank account from which only he was authorized to make withdrawals. Id. The other partners initiated an action against the taxpayer seeking a portion of the amount of the accounts receivable. Id. One of

the issues was whether the original agreement that the taxpayer was entitled to all assets upon dissolution was binding on the partners at the time of the actual dissolution.  Id.  The Commissioner determined that, in accordance with the claim-of-right doctrine, the entire amount of collected receivables constituted income to the taxpayer.  Id.

Initially, we addressed whether the amounts collected by the taxpayer would be taxable to him if he received them in a nonpartner capacity as the result of the dissolution of the partnership and where the amounts were clearly received under a claim of right by virtue of the original agreement and without restriction as to their disposition.  Id. at 678.  We found that if that were the case, the amounts were clearly taxable to the taxpayer.  Id.  Next, we addressed whether, assuming the amounts were partnership income, the claim-of-right doctrine applied.  We stated:

> When a dispute arises over how much partnership income a partner is entitled to, we do not believe that section 702(c), or any other provision of subchapter K, changes the general principle that a taxpayer must include in income funds which he acquires under a claim of right and without restriction as to their disposition. * * *  [Id. at 679 (citing Estate of Kahr v. Commissioner, supra at 934).]

We assumed without deciding that if the amounts were partnership income taxable in part to the other partners, then those partners would appear to have offsetting losses, and the taxpayer would still be considered as having income to the full extent of the

amounts collected.  Id. at 679.  We did not render a holding as to whether the other partners were relieved of their responsibility of reporting their distributive shares of the receivables.

In the instant case, assuming that the claim-of-right doctrine may apply in this situation, we are not convinced that Russell acquired the proceeds from the grain sales under a claim of right and without restriction as to their disposition.  The evidence reflects, and we have found, that the grain sold in 1994 was partnership property.  The evidence in the record reflects that Melvin and Russell allowed each other to withdraw the profits from the respective activity each brother primarily conducted, not that each partner was entitled to dispose of the income from his respective activity without restriction.  Russell testified that there was nothing to prevent Melvin from writing a check on the BBP farm account and that if Melvin wanted some money from the farming activity, then Russell would either write a check or Melvin would sign a note and Russell would pay the note.[22]  In the lawsuit, which included the dispute concerning BBP, the estate sought to enforce its legal rights against Russell to recover one-half of the farm income.  The estate also originally claimed on its 1994 tax return that it was entitled to

_____

[22]Additionally, the evidence in the record indicates that a payment of $73,181.24 was made to Jean Ballantyne on Oct. 18, 1994, from Bottineau for the sale of grain.

a theft loss for one-half of the farm income on the grounds that Russell embezzled the income. However, the estate dropped its embezzlement claim against Russell in exchange for $2 million and approximately one-half of the remaining partnership property, and the estate has not argued, nor does the record establish, that Russell embezzled the proceeds from the grain sales. Thus, we hold that Russell did not have a claim of right to the grain sales proceeds, and the estate is not relieved of its obligation to report one-half of the grain sales for 1994 proceeds in its gross income for that year.[23]

---

[23]Even if we were to find that Russell acquired the grain sale proceeds under a claim of right and without restriction as to their disposition, it appears that the estate would still be required to report the full amount of its 50-percent distributive share in BBP. In Cipparone v. Commissioner, T.C. Memo. 1985-234, we stated:

> Partners are taxable on the full amount of their distributive share even where a partner is unaware that partnership income has been earned, and another partner has embezzled it without his knowledge. Commissioner v. Estate of Goldberger, 213 F.2d 78 (3d Cir. 1954), affg. in part and revg. in part sub nom. Trounstine v. Commissioner, 18 T.C. 1233 (1952); Stoumen v. Commissioner, 208 F.2d 903 (3d Cir. 1953). This Court has expressly followed Goldberger and Stoumen in Beck Chemical Equipment Corp. v. Commissioner, 27 T.C. 840, 855-856 (1957).

We have already found that the grain sold in 1994 was partnership property. Thus, because the estate's distributive share was one-half of all the partnership items, it would have to include one-half of the grain sales proceeds in gross income. The estate has not otherwise argued or presented evidence in this proceeding to establish that it is entitled to deduct one-half of the grain sales proceeds as a theft loss.

III. Distributions in Excess of Basis

Respondent argues that, to the extent that the grain sales proceeds and other money Russell received from BBP in 1994 exceeded his adjusted basis in the partnership, Russell had additional taxable income. Russell maintains that he possessed sufficient basis to withdraw the cash from the grain sales without incurring any additional tax liability.

As a preliminary matter, we must determine which party bears the burden of proof on this issue. Russell argues that the notice of deficiency containing the adjustment for grain income did not raise the issue of withdrawal in excess of basis as a theory for increasing Russell's gross income by $751,988. Russell maintains that this alternate theory was not tried by the implied consent of the parties. In the event the issue was tried by the implied consent of the parties, Russell contends that resolution of the issue requires the presentation of evidence that is different from that which would be necessary to resolve the proper reporting of grain sales income as between the estate and Russell.

Respondent recognizes that this issue was not expressly raised in the notice of deficiency. On brief, respondent states:

> Although not expressly set forth in the notice of
> deficiency, this argument is an additional ground for
> the $751,988.29 adjustment to Russell Ballantyne's
> taxable income in 1994. It was addressed by both
> respondent and Russell Ballantyne in the parties' trial
> memoranda and evidence applicable to the argument was

presented at trial. Thus, even if not specifically raised in the pleadings, the matter has been tried by the implied consent of the parties. T.C. Rule 41(b).

Rule 41(b) states that "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." In the instant case, respondent admits that the issue of whether Russell withdrew cash in excess of his basis was not specifically raised in the pleadings. However, the evidence reflects that both parties were aware, before trial, that respondent was pursuing this alternative argument. Respondent alleges that, before trial, he repeatedly requested information from Russell regarding his basis in BBP. This allegation is supported by respondent's interrogatories to Russell which requested information necessary to calculate Russell's basis in BBP during the years in issue and by Mr. Feldmann's testimony at trial that an agent of respondent brought up the issue of Russell's basis in BBP during the audit process. Additionally, respondent's trial memorandum lists one of the issues in this case as:

> Whether Russell Ballantyne had additional income in 1994 from the sale of grain in the amount of $751,988.00. Alternatively, whether Russell Ballantyne received a distribution from BBP in 1994 that exceeded his basis in the partnership by $751,988.00.

Russell's trial memorandum states that "Russell Ballantyne has sufficient basis for his withdrawal of grain income." Russell

also provided a short analysis of legal authorities governing the determination of a partner's basis.  At trial, testimony was elicited from various witnesses as to Russell's basis in BBP and whether he withdrew amounts in excess of his basis.  Finally, both parties specifically addressed this issue in their opening and reply briefs.  Thus, we find that this issue was tried by the implied consent of the parties.

As a general rule, the Commissioner's determination bears a presumption of correctness, and the burden of proof rests with the taxpayer.[24]  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  However, section 7522 requires that a notice of deficiency "describe the basis" for the tax deficiency.  In certain circumstances, the failure to "describe the basis" for the tax deficiency results in the raising of a new matter under Rule 142(a).  Shea v. Commissioner, 112 T.C. 183, 197 (1999); Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989).

In Shea v. Commissioner, supra at 197, we stated:

> We have previously held that new matter is raised when the basis or theory on which the Commissioner relies was not stated or described in the notice of deficiency and the new theory or basis requires the presentation of different evidence.  Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. at 507.  This rule for determining whether a new matter has been raised by the Commissioner is consistent with, and supported by, the statutory requirement that the notice of deficiency

---

[24]As we noted earlier, it has not been established that the examination of Russell and Clarice began after July 22, 1998, or that sec. 7491 applies.  See supra note 14.

> "describe the basis" for the Commissioner's
> determination.  This rule also provides a reasonable
> method for enforcing the requirements of section 7522.
> [Fn. ref. omitted.]

We then held that where the notice of deficiency fails to describe the basis on which the Commissioner relies to support a deficiency determination and that basis requires the presentation of evidence that is different from that which would be necessary to resolve the determinations described in the notice of deficiency, the burden of proof will be placed on the Commissioner with respect to that issue.  Id.

In the instant case, the notice of deficiency increased Russell and Clarice's gross income for 1994 by $751,988.  Respondent identified this adjustment under the heading "ORDINARY INCOME (WHIPSAW)" and explained that "We have adjusted your gross income to include amounts received for grain income for $751,988.00 in 1994."  No further explanation was provided regarding the reason for including the additional amount in gross income.  In their petition, Russell and Clarice alleged that respondent "erroneously included within the taxpayers' gross income grain income in the amount of $751,988 for the tax year 1994".  In his answer, respondent denied this allegation but did not elaborate on the reason for the inclusion of the additional amount in gross income.  Thus, neither the notice of deficiency nor respondent's answer to Russell and Clarice's petition describes distributions in excess of basis as respondent's reason

for increasing gross income.  Indeed, respondent acknowledges on brief that the distributions in excess of basis theory was not set forth in the notice of deficiency.  The evidence in the record demonstrates that the adjustment in the notice of deficiency was based on respondent's whipsaw position that Russell should have reported all the grain sales proceeds in income because the grain was solely Russell's property, not partnership property.  In the instant case, the determination of whether the grain sold in 1994 was Russell's sole property is not dependent on, and does not require a determination of, the amount of Russell's basis in his partnership interest.  The evidence necessary to establish Russell's basis in his partnership interest is different from the evidence necessary to establish that the grain sold in 1994 was solely Russell's property. Accordingly, respondent bears the burden of proof on this issue. Shea v. Commissioner, supra at 197; Wayne Bolt & Nut Co. v. Commissioner, supra at 507.

Section 731(a) defines the circumstances under which a partner recognizes gain or loss from partnership distributions. In the case of a distribution by a partnership to a partner, gain is recognized only to the extent that any money distributed exceeds the adjusted basis of a partner's interest in the partnership immediately before the distribution.  Sec. 731(a)(1); Jacobson v. Commissioner, 96 T.C. 577, 584 (1991), affd. 963 F.2d

218 (8th Cir. 1992). Any gain recognized under section 731(a) is considered as gain from the sale or exchange of the partnership interest of the distributee partner. Sec. 731(a); P.D.B. Sports, Ltd. v. Commissioner, 109 T.C. 423, 441 (1997). In the case of a sale or exchange of an interest in a partnership, gain recognized to the transferor partner is generally treated as gain from the sale or exchange of a capital asset. Sec. 741; Colonnade Condo., Inc. v. Commissioner, 91 T.C. 793, 814 (1988).

Section 722 provides that the basis of a partnership interest acquired by contribution of property, including money, is "the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution". For purposes of section 722, a contribution of money includes "Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities". Sec. 752(a). Section 705(a) provides the general rule for determining the adjusted basis of a partner's interest as determined under section 722. In relevant part, section 705(a) provides that the adjusted basis of a partner's interest in a partnership is the basis determined under section 722 (1) increased by the partner's distributive share of partnership income for the tax year and prior years and (2) decreased (but not below zero) by distributions from the

partnership under section 733 and by his distributive share of partnership losses for the tax year and prior years. Section 733 provides that, in the case of a distribution by a partnership to a partner other than in liquidation of a partner's interest, the adjusted basis of the partner is reduced by the amount of money distributed to that partner. Additionally, any decrease in a partner's share of the liabilities of a partnership is considered a distribution of money to the partner by the partnership. Sec. 752(b).

Respondent claims that BBP maintained inadequate accounting records and that there is no direct evidence establishing each partner's basis in BBP. Respondent argues that in a situation such as this one, it is appropriate to apply the alternative rule set forth in the regulations under section 705 to determine Russell's adjusted basis in his partnership interest.

Section 705(b) grants the Secretary the authority to prescribe regulations under which the adjusted basis of a partner's interest in a partnership may be determined by reference to his proportionate share of the adjusted basis of partnership property upon a termination of the partnership. Section 1.705-1(b), Income Tax Regs., provides that "the adjusted basis of a partner's interest in a partnership may be determined by reference to the partner's share of the adjusted basis of partnership property which would be distributable upon

termination of the partnership." This alternative rule may be used in circumstances where a partner cannot practicably apply the general rule set forth in section 705(a) and section 1.705-1(a), Income Tax Regs., or where, from a consideration of all the facts, the Commissioner reasonably concludes that the result will not vary substantially from the result obtainable under the general rule. Sec. 1.705-1(b), Income Tax Regs. Where the alternative rule is used, certain adjustments may be necessary in order to ensure the proper determination of the adjusted basis of a partner's interest in a partnership. Id.

In the instant case, BBP was formed in 1943. The records of the partnership do not show the amount of cash contributions, or the basis in property contributed by Melvin or Russell to BBP. Additionally, a calculation of the distributions made to each partner cannot be made. The partnership tax returns in the record cover only the years 1980 through 1994. Under these circumstances, it is appropriate for respondent to apply the alternative rule set forth in section 1.705-1(b), Income Tax Regs., in order to attempt to establish Russell's adjusted basis in his 50-percent partnership interest.

Respondent points out that BBP reported that the total assets and total liabilities of the partnership at both the beginning and the end of the taxable year 1994 were "None". Additionally, respondent notes that BBP's 1994 return reported

that Russell's capital account had a balance of zero at both the beginning and the end of the taxable year. The Schedule K-1 attached to the 1994 Form 1065 listed the amounts in Melvin's and Russell's capital accounts at the beginning and end of the taxable year as "0". Russell signed BBP's 1994 tax return. Respondent claims that Russell should not be lightly relieved of the sworn representations he made in BBP's 1994 tax return.

Mr. Feldmann explained that the word "None" that was listed on BBP's tax returns for total assets and total liabilities for 1993 and 1994 did not mean that there were zero assets and liabilities; rather the word "None" was the default position generated by the computer software he used when no entry was made. Likewise, Mr. Feldmann testified that the amount "zero" for the capital accounts was also a default position when no entry was made. Mr. Feldmann testified that he left these areas blank because he did not have the information necessary to fill in these areas on the tax returns. Mr. Feldmann explained that had he made an entry, he would have put "not available" or "information not available" in order to reflect the fact he did not have the necessary information. BBP's records were not maintained in a manner sufficient to determine the partnership's assets and liabilities.[25] Consequently, Mr. Feldmann did not

---

[25]We note that the estate claimed in its original and amended returns for the taxable year 1995 that as of the date of
(continued...)

have the necessary information to provide specific amounts when he prepared BBP's tax returns. However, the fact that the partnership returns failed to report specific amounts of assets and liabilities does not mean that Russell did not have a positive basis in his partnership interest. It is evident that the partnership returns are incorrect, and respondent cannot rely upon them to meet his burden.

At trial, Russell introduced two loan statements addressed to BBP. The first statement, from FCS of NW North Dakota, reflects an operating loan with a principal balance of $678,860.67 as of January 1, 1994, and $649,537.49 as of December 31, 1994. The second statement, from the First Bank Minot, reflects a loan with a balance of $157,803.26 as of March 31, 1994. Russell claims that these loans reflect a basis of at least one-half of the combined loan balances, or $403,670, because he obligated himself for the partnership debt.[26] Russell claims that he had additional basis as a result of certain adjustments contained in the notice of deficiency. Russell also contends that Melvin withdrew more money from BBP over the years

---

[25](...continued)
Melvin's death, the assets of BBP "consisted of cash, marketable securities, notes receivable, oil and gas properties, office furniture and fixtures, farm inventory, seed, buildings and equipment having a fair market value of $1,463,019."

[26]At trial, Russell and Mr. Feldmann testified that these loans were fully paid in 1998, one-half by Russell and one-half by a limited partnership formed for Melvin's children.

than he did and that this supports his arguments that Russell had sufficient basis in BBP in 1994 to avoid being taxed on the amounts distributed in excess of his distributive share. Finally, Russell relies on Mr. Feldmann's testimony that he had withdrawn considerably less money from BBP than Melvin had and that Russell would have had a positive basis after receiving the grain sales proceeds in 1994.

Respondent argues that Russell has not shown that the basis imputed to his partnership interest from the liabilities still existed in 1994 or had not been used up by prior distributions. Respondent claims that intervening events likely affected Russell's basis in BBP and that the existence of the loans does not establish that Russell had any basis in BBP. Respondent contends that as a result of partnership adjustments proposed to Russell and settled for 1993 and 1994, Russell's basis in the partnership would have increased at most by $143,203. However, respondent claims that without further information as to prior distributions made to Russell, it cannot be determined that Russell had sufficient basis in BBP to withdraw the entire grain proceeds in 1994 as a tax-free distribution. Respondent claims that Mr. Feldmann's testimony that he was aware of the two loans is inconsistent with his preparation of BBP's 1994 return in which each partner's capital account was reported as being zero at both the beginning and the end of 1994. Finally, respondent

contends that any basis Russell had in his partnership interest as of January 1, 1994, would have been rapidly depleted by the partners' distribution of assets in anticipation of Melvin's death.

At trial, both Russell and Mr. Feldmann testified that Russell had withdrawn considerably less money than Melvin had from BBP. Mr. Feldmann testified that he was aware of the two loans totaling approximately $800,000 and that he believed that Russell paid off one-half of the debt sometime after Melvin's death. Mr. Feldmann testified that he attempted to calculate Russell's basis in BBP, and, although he could not determine a specific amount, he believed that Russell had a positive basis in BBP after receiving the grain sales proceeds in 1994.

BBP's records are insufficient to determine each partner's relative capital contributions and the amount of distributions made to each partner over the life of the partnership. The evidence in the record reflects that, during BBP's existence, Melvin and Russell generally allowed each other to withdraw the profits from the respective activities they conducted, and, at least for the years 1980 through 1994, the oil and gas activity was more profitable overall than the farming activity. The partnership tax returns and the fact that Melvin and Russell generally kept the profits from their respective activities support Russell's and Mr. Feldman's testimony that, with respect

to the amounts withdrawn or distributed from BBP over the existence of the partnership, Melvin withdrew more money from the partnership than Russell did.  Overall, the evidence supports Russell's argument that he had a positive basis in his partnership interest in 1994 after receiving the grain sales proceeds.

It is respondent's burden to prove that Russell received distributions from BBP in excess of his basis in his partnership interest.  See Shea v. Commissioner, 112 T.C. at 197; Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. at 507.  After reviewing all the evidence in the record, including Russell's and Mr. Feldmann's testimony on the issue and the effect of the stipulated adjustments on Russell's basis, we conclude that respondent has failed to establish that Russell received money from BBP in 1994 in excess of his basis in his partnership interest.  Accordingly, we hold for Russell on this issue.

IV.  Accuracy-Related Penalties for 1994 and 1995

In the notice of deficiency, respondent determined that Russell and Clarice were liable for the accuracy-related penalties pursuant to section 6662(a) on the portions of their underpayments attributable to the following adjustments contained in the notice of deficiency:

| Adjustment | Amount of Adjustment | |
| | 1994 | 1995 |
| --- | --- | --- |
| Schedule E - depletion | $51,627 | $101,923 |
| Ordinary income | 751,988 | -- |
| Canadian royalty | -- | 56,504 |
| Schedule C - production tax | -- | 5,353 |
| Schedule C - IDC | -- | 97,790 |
| Schedule C - depletion | -- | 53,067 |

Respondent subsequently conceded the Canadian royalty adjustment. Russell and Clarice conceded the Schedule C and Schedule E adjustments. Our decision on the ordinary income adjustment is in Russell and Clarice's favor. Consequently, we must decide whether Russell and Clarice are liable for the accuracy-related penalties with respect to the Schedule C and Schedule E adjustments.

Section 6662(a) imposes a penalty equal to 20 percent of the portion of an underpayment of tax attributable to a taxpayer's negligence, disregard of rules or regulations, or substantial understatement of income tax. Sec. 6662(a), (b)(1), and (2). "Negligence" has been defined as the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The term "disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c). An understatement is "substantial" if it exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return. Sec. 6662(d)(1) and (2). The Commissioner's determination that a taxpayer was negligent is presumptively

correct, and the burden is on the taxpayer to show a lack of negligence. Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337.[27]

Section 6664(c) provides an exception to the accuracy-related penalty under section 6662(a). The exception applies if it is shown that there was reasonable cause for the underpayment and that the taxpayer acted in good faith with respect to the underpayment. Sec. 6664(c). The determination of whether a taxpayer acted with reasonable cause and good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The extent of the taxpayer's effort to assess his proper tax liability is the most important factor. Id.

Russell claims that he is not liable for the section 6662(a) penalties because he relied in good faith on the advice of his accountant, Mr. Feldmann, and most of the adjustments relate to oil and gas transactions which were handled by Melvin and his family. The accuracy-related penalty under section 6662(a) may be avoided if the taxpayer shows reliance on the advice of a professional which was reasonable and in good faith. Sec. 1.6664-4(b)(1), Income Tax Regs. Reasonable cause can be established if a taxpayer can show reasonable reliance on the

---

[27]As previously noted, sec. 7491 does not apply in this case. See supra note 14.

advice of a competent and experienced accountant or attorney in the preparation of the tax return.  Weis v. Commissioner, 94 T.C. 473, 487 (1990); Griffin v. Commissioner, T.C. Memo. 2001-5.  In order to show good faith reliance, the taxpayer must establish that all necessary information was supplied to the return preparer and that the incorrect return resulted from the preparer's mistakes.  Weis v. Commissioner, supra at 487; Pessin v. Commissioner, 59 T.C. 473, 489 (1972).

Mr. Feldmann prepared BBP's 1994 return and Russell and Clarice's 1994 and 1995 returns.  In preparing the returns, Mr. Feldmann relied on information provided to him by Russell and his family and Melvin's family.  With respect to the oil and gas activity conducted by BBP, Mr. Feldmann testified that he relied on Forms 1099-MISC, Miscellaneous Income, issued by oil purchasers in determining income and information provided by Carolyn in determining expenses.  At trial, Russell testified that he did not know anything about the information regarding the oil and gas interests which were reported on his and Clarice's 1994 and 1995 returns because this information was provided to Mr. Feldmann by other persons.

With respect to the Schedule E and Schedule C depletion deductions for 1994 and 1995, Mr. Feldmann testified that he erroneously computed the amounts of these deductions and that the errors were not a result of any action by Russell.  Mr. Feldmann

testified that he had the correct information to compute the amounts of the deductions, but he explained that the law governing these deductions had changed in previous years and that he had not updated himself on the change. Overall, the evidence reflects that Mr. Feldmann was provided with all the necessary information to compute the correct amounts of the depletion deductions for 1994 and 1995 and that the incorrect amounts reported on the returns were solely attributable to his failure to apply the law correctly. Accordingly, we hold that Russell and Clarice are not liable for the accuracy-related penalties on the portions of the underpayments attributable to the depletion deduction adjustments.

For the taxable year 1995, Carolyn provided Mr. Feldmann with the information regarding IDCs paid by Russell in 1995. A portion of the IDCs deducted by Russell in 1995 had actually been reimbursed to him by Ballantyne Oil and Gas, Inc., during that year. Mr. Feldmann was not informed that Russell had been reimbursed for approximately $97,790 of those expenses, and he did not account for the amount reimbursed when he computed the amount of the IDC deduction. At trial, Russell acknowledged that he knew that a portion of IDCs was sometimes reimbursed later. However, Russell claimed that he would not have been aware of any reimbursement because the amount reimbursed was automatically deposited in his bank account, and he would not have received a

check.  Russell testified that he thought Mr. Feldmann was aware of any reimbursements for the drilling costs when the oil and gas information was provided to him.

Russell has not shown that there was reasonable cause for the underpayment attributable to the overstated IDC deduction and that the he acted in good faith with respect to the underpayment. Russell was aware that a portion of IDCs might be reimbursed to him, yet he did not take steps to inquire as to whether any amount was reimbursed to him in 1995.  In the instant situation, he cannot avoid his duty to file an accurate tax return by placing the responsibility with Carolyn to provide Mr. Feldmann with the correct information regarding the amount of IDCs. Accordingly, we hold that Russell and Clarice are liable for the accuracy-related penalty on the portion of the underpayment attributable to the IDC adjustment.

With respect to the Schedule C production tax deduction, Mr. Feldmann testified that he would have calculated this based on the information he received from Russell's family or Melvin's family.  Russell's only claim with respect to this adjustment is that he reasonably relied on the advice of Mr. Feldmann.  He has not shown that all necessary information was supplied to Mr. Feldmann and that the overstated deduction resulted from Mr. Feldmann's mistake.  Russell and Clarice have not established that they had reasonable cause or good faith with respect to this

adjustment.  Accordingly, we hold that Russell and Clarice are liable for the accuracy-related penalty on the portion of the underpayment attributable to the production tax adjustment.

<u>Decisions will be entered under Rule 155</u>.